# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No. 4:18-cv-1098 |
| | : |
| THE LIFEPAY GROUP, LLC, et al., | : |
| | : |
| Defendants. | : |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
## AS TO DEFENDANT WATTS AND MEMORANDUM OF LAW IN SUPPORT

Dated: June 14, 2019

Respectfully submitted,

*/s/ Jennifer D. Reece*
Jennifer D. Reece
Attorney-in-Charge
Texas Bar No. 00796242
S.D. Bar No. 899792
Timothy S. McCole
S.D. Tex. Bar No. 37943
Mississippi Bar No. 10628
U. S. Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, Texas 76102-6882
Tel: (817) 978-6442(jr)
Fax: (817) 978-4927
*reecej@sec.gov*
COUNSEL FOR PLAINTIFF
SECURITIES AND EXCHANGE COMMISSION

## CERTIFICATE OF SERVICE

I certify that on June 14, 2019, I electronically filed the following document with the clerk of the court for the U.S. District Court, Southern District of Texas, Houston Division, using the electronic case filing system of the court. I hereby certify that I have served all parties in accordance with FED. R. CIV. P. 5(b)(2).

*s/Jennifer D. Reece*
Jennifer D. Reece

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... v-vii

I.   NATURE AND STAGE OF PROCEEDINGS ....................................................................1

II.  SUMMARY OF THE ARGUMENT ..................................................................................1

III. ISSUES TO BE RULED ON BY THE COURT ................................................................2

IV. SUMMARY JUDGMENT STANDARD ...........................................................................2

V.  STATEMENT OF FACTS ..................................................................................................3

    A. Defendants' History ......................................................................................................3

    B. The SMDRE Promissory Note Offering........................................................................5

        1.  False and Misleading Statements in the SMDRE Offering ...........................6

        2.  False and Misleading Statements in the SMDRE Loan Agreements .............9

VI. ARGUMENT AND AUTHORITES ....................................................................................14

    A. The Court Should Grant Summary Judgment on the SEC's First Claim for Relief
       Because Watts Violated Section 5 of the Securities Act ............................................14

        1.  Section 5 Imposes Strict Liability for the Sale of Unregistered Securities...14

        2.  The SEC Has Established a *Prima Facie* Section 5 Violation ....................16

    B. The Court Should Grant Summary Judgment on the SEC's Second and Third Claims
       for Relief Because Watts Defrauded Investors ..........................................................17

        1.  Elements of Securities Fraud .......................................................................17

        2.  Watts Made Material Misrepresentations and Omissions Associated with the
           Promissory Notes and the Use and Disposition of Investor Funds...............19

        3.  Examples of Watt's Fraud ...........................................................................20

           a.  Watts violated Sections 17(a) and 10(b) by failing to disclose the
              commissions that he paid to Stanley for finding investors .................20

b. Watts violated Sections 17(a) and 10(b) by failing to disclose his related party transactions and conflicts of interest.............................21

c. Watts violated Sections 17(a) and 10(b) by failing to disclose SMDRE's poor financial condition ....................................................23

d. Watts violated Sections 17(a) and 10(b) by misrepresenting the use and disposition of investor funds .......................................................24

4. Watts Violated Sections 17(a)(2) and 17(a)(3) of The Securities Act ............25

VII. CONCLUSION ........................................................................................................25

# TABLE OF AUTHORITIES

Aaron v. SEC,
    446 U.S. 680 (1980) .................................................... 2, 18

Allison v. Ticor Titel Ins. Co.,
    907 F.2d 645 (7th Cir. 1990) ....................................... 15

Anderson v. Libby Lobby, Inc.,
    477 U.S. 242 (1986) .................................................... 3

Broad v. Rockwell Int'l Corp.,
    642 F. 2d 929 (5th Cir.) .............................................. 2, 18

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986) .................................................... 2

Ernst & Ernst v. Hochfelder,
    425 U.S. 185, 193 n.12 (1976) .................................... 18

Forsyth v. Barr,
    19 F.3d 1527 (5th Cir. 1994) ...................................... 2-3

Hanon v. Dataproducts Corp.,
    976 F.2d 497 (9th Cir. 1992) ...................................... 19

Hassinger v. JP Morgan Chase & Co.,
    394 Fed. Appx. 63 (5th Cir. 2010) .............................. 3

Reves v. Ernst & Young,
    494 U.S. 56–68 (1990) ............................................... 16

SEC v. Aaron,
    605 F.2d 612 (2d Cir. 1979) ...................................... 15

SEC v. Alliance Leasing Corp.,
    2000 WL 35612001 (S.D. Cali. Mar. 20, 2000) ........... 22-23

SEC v. Continental Tobacco Co.,
    463 F.2d 137 (5th Cir. 1972) ..................................... 2, 15

SEC v. Cross Fin'l Svcs., Inc.,
    908 F. Supp. 718 ...................................................... 16, 17

SEC v. Farmer, No. 4:14-CV-2345,
    2015 WL 5838867 (S.D. Tex. Oct. 7, 2015) ................ 16

SEC v. Fehn,
    97 F.3d 1276, 1290 n.12 (9th Cir. 1996) ..................... 19

SEC v. Feng,

2017 WL 6551107 at *10 ................................................ 21

SEC v. Gann,
656 F. 3d 932 (5th Cir. 2009) ...................................... 2, 18, 19

SEC v. Hasho,
784 F. Supp. 1059 (9th Cir. 1992) ............................... 21, 24

SEC v. Holschuh,
694 F.2d 130, 137 n.10 (9th Cir. 1982) ........................ 15

SEC v. Hopper,
2006 WL 778640 at *9 (S.D. Tex. Mar. 24, 2006) ........... 2, 18, 25

SEC v. Murphy,
626 F.2d 633 (9th Cir. 1980) ....................................... 24

SEC v. Platforms Wireless International Corp., (quoting *Phan*, 500 F.3d at 908)
617 F.3d 1072 (9th Cir. 2010) .............................. 15-16, 19

SEC v. Provident Royalties, LLC,
2013 WL 5314354 (N.D. Tex. Sept. 23, 2013) ................ 19

SEC v. Ralston Purina Co.,
346 U.S. 119 (1953) .................................................... 15

SEC v. Rana Research, Inc.,
8 F.3d 1358 (9th Cir. 1993) ........................................ 18

SEC v. Seghers,
298 F. App'x 319 (5th Cir. 2008) .............................. 18, 19

SEC v. Tecumseh Holdings,
765 F. Supp. 2d 340 (S.D.N.Y. 2011) ......................... 24

SEC v. W.J. Howey Co.,
328 U.S. 293 (1943) .................................................... 16

Shaw Constructors v. ICF Kaiser Eng'rs, Inc.,
395 F.3d 533 (5th Cir. 2004) ....................................... 3

Swenson v. Engelstad,
626 F.2d 421 (5th Cir. 1980) ....................................... 15

Tidewater Inc. v. United States,
565 F.3d 299 (5th Cir. 2009) ....................................... 3

United States v. Laurienti,
611 F.3d 530 (9th Cir. 2010) ....................................... 21

<u>Vernazza v. SEC</u>,
  327 F. 3d 851 (9th Cir.) .......................................................................................... 23

## STATUES

Rule 10b-5 [17 C.F.R. §§ 240.10b-5] ....................................................................... 2, 17-18

Section 5 of the Securities Act of 1933 [15 U.S.C. §§ 77e] .................................... 14-17

Section 5(a) of the Securities Act of 1933 [15 U.S.C. §§ 77e(a)] ...........................2, 14,16

Section 5(c) of the Securities Act of 1933 [15 U.S.C. §§ 77e(c)...............................  2,16

Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. §§ 78j(b)]  ................. 2, 17-18

Section 17(a) of the Securities Act of 1933 [15 U.S.C. §§ 77q (a)] ....................... 2, 17-18, 20-24

Section 17(a)(1) of the Securities Act of 1933 [15 U.S.C. §§ 77q (a)(1)] .............................. 2, 18

Section 17(a)(2) of the Securities Act of 1933 [15 U.S.C. §§ 77q (a)(2)]........................2, 18, 25

Section 17(a)(3) of the Securities Act of 1933 [15 U.S.C. §§ 77q (a)(3)]........................2, 18, 25

Pursuant to Fed. R. Civ. P. 56, Plaintiff Securities and Exchange Commission ("Plaintiff" or "Commission") respectfully shows as follows:

## I.   NATURE AND STAGE OF PROCEDING

The Commission filed its Complaint on April 6, 2018.  This is a securities fraud action arising from the defendants' offer and sale of unregistered securities in the form of promissory notes issued by SMDRE, LLC ("SMDRE"), an entity formed by Watts and owned and controlled by both Watts and Clifton Stanley ("Stanley").  While the Commission's Complaint also details a Ponzi scheme run by Stanley through his retirement planning and real estate investment business, The Lifepay Group, LLC ("LifePay"), Stanley has settled all matters of liability, along with Lifepay and SMDRE.  [*See* Docs. 34-36 (Agreed Partial Judgments)].  Thus, only the Commission's claims against Watts remain for determination.

## II.   SUMMARY OF THE ARGUMENT

From February 2015 to February 2017, Stanley and Watts raised $1.4 million from approximately 10 investors through the sale of promissory notes that they told investors would be used to purchase "oil and gas assets."  Watts represented that investors would earn a return of up to 20% compounded annually and that the investment was low risk.

Watts violated the federal securities laws by, among other things: (1) failing to register the SMDRE offering with the SEC; (2) failing to disclose to investors that he paid Stanley a 10 - 15% commission on every dollar of investor funds; (3) failing to disclose to investors that SMDRE's liabilities far exceeded its assets which made promised returns impossible; (4) failing to disclose related party transactions and conflicts of interest; and (5) misusing investor funds.

Because there is no triable issue for the Court, the Commission asks the Court to grant its motion for summary judgment on each claim of the Complaint against Watts (Claims 1-3).

### III.   ISSUES TO BE RULED ON BY THE COURT

The issues for the Court are, whether there is any genuine issue of material fact that:

1.      Watts violated Section 5(a) and 5(c) of the Securities Act of 1933 by: (a) selling or offering to sell securities; (b) through the use of interstate transportation or communication; (c) when no registration statement was in effect as to the transaction. *SEC v. Continental Tobacco Co.*, 463 F.2d 137, 155 (5th Cir. 1972).

2.      Watts violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by making: (a) a material misrepresentation, omission of material fact, or other fraudulent device; (b) in connection with the purchase, offer, or sale of a security; (c) with the requisite mental state. *Aaron v. SEC,* 446 U.S. 680, 695 (1980); *SEC v. Gann,* 656 F. 3d 932, 936 (5th Cir. 2009).  Violations of Section 17(a)(1), Section 10(b), and Rule 10b-5 require a showing that the defendant acted intentionally or with severe recklessness. *Aaron,* 446 U.S. at 697; *see Broad v. Rockwell Int'l Corp.*, 642 F. 2d 929 (5th Cir.) *en banc, cert. denied* 454 U.S. 965 (1981).  Violations of Sections 17(a)(2) and (a)(3) require, at most, a showing of negligence. *See SEC v. Hopper,* 2006 WL 778640 at *9 (S.D. Tex. Mar. 24, 2006).

### IV.   SUMMARY JUDGMENT STANDARD

Summary judgment, "upon all or any part of [a] claim," is appropriate where there is no genuine dispute as to any material fact regarding that portion of the claim.  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The SEC, as the movant, bears the initial burden of identifying the evidence that demonstrates the absence of any material fact.  *See Celotex*, 477 U.S. at 323.  Once that burden is met, the defendants cannot rest on mere denials, conclusory statements, or evidence that is merely colorable or not significantly probative to defeat the motion.  *Celotex Corp.,* 477 U.S. at 324*; Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir. 1994)

("Needless to say, unsubstantiated assertions are not competent summary judgment evidence."). Instead, they must submit significant probative *evidence* to show that material, triable issues of fact remain. *See Anderson v. Libby Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). "The mere scintilla of evidence in support of the [nonmoving party's] position will be insufficient." *Id.* at 252. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

"On cross motions for summary judgment, the court reviews each motion independently, viewing the evidence and inferences in the light most favorable to the non-moving party." *Hassinger v. JP Morgan Chase & Co.*, 394 Fed. Appx. 63, 65 (5th Cir. 2010); *see also Tidewater Inc. v. United States*, 565 F.3d 299, 302 (5th Cir. 2009). "If there is no genuine issue and one of the parties is entitled to prevail as a matter of law, [this] court may render summary judgment." *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 539 (5th Cir. 2004).

In short, the Court must enter summary judgment if, under the governing law, there is only one reasonable conclusion. *Anderson,* 477 U.S. at 250.

## V.   <u>STATEMENT OF FACTS</u>[1]

### A.   **Defendants' History**

1.      Michael Watts, age 63, is an experienced securities professional, having served as a registered representative at several broker-dealers between 1988 and 1999. (App. 35 [Declaration of SEC Staff Accountant Carol Hahn ("Hahn Dec.") ¶ 6].) On June 19, 2000, Watts was fined $10,000, suspended from association with any NASD member in any capacity for one year, and required to pay $81,514 for failing to honor an NYSE arbitration award. (*Id.*) Watts was also a consultant who had connections to several OTC-traded penny stock companies. (App. 391 [Watts Depo. 17:15-18:14].)

---

[1]  Each fact in the Statement of Facts ("SOF") is supported by, and cited to, evidence contained in Plaintiff's Appendices in Support of its Motion for Summary Judgment ("App.") filed concurrently with this motion, and fully incorporated herein. The evidentiary citations in the Argument section are to the SOF.

2.     Watts is a defendant in two other SEC fraud cases.  *See SEC v. Watts et al.,* Case

No. 4:17-cv-00539 (S.D. Tex., filed Feb. 17, 2017) (alleging fraud in connection with a 2013

scheme to list Hydrocarb Energy Corporation ("Hydrocarb"), a company controlled by Watts's

brother); *SEC v.  Powertraderspress.com, Inc. et al.,* Case No. 1:17-CV-04133, (E.D.N.Y., filed

July 12, 2017) (alleging a boiler room scheme that involved fraud and market manipulation in

connection with Hydrocarb's stock that occurred from mid-2014 to early 2016).  Watts was

criminally charged for his role in the boiler room scheme.  *See United States v. Chartier, et al.,*

Case 1:17-cr-00372-JS-GRB (E.D.N.Y., filed July 11, 2017).   (App. 323-372.)

3.     In 2012, Watts formed SMDRE, an entity that purportedly invests in oil and gas

assets.  (App. 37 [Hahn Dec. ¶ 9].)  In January 2013, Watts transferred a 51% ownership stake in

SMDRE to Stanley.  (App. 403-404 [Watts Depo. 68:7-70:4]; App. 426.)  During all relevant

periods, Watts controlled SMDRE's bank accounts at Wells Fargo Bank, Amegy Bank, and

Chase Bank; he paid SMDRE's bills, signed checks, and authorized wire transfers. (App. 400,

401 [Watts Depo 54:5-23; 57:10-24]; App. 37 [Hahn Dec. ¶ 9].)

4.     Watts owns and controls two other business entities: (1) Lifestream, LLC

("Lifestream"), an entity he uses to invest in oil and gas properties (App. 390, 392 [Watts Depo.

15:6-12; 23:2-14]); and (2) Geoserve Marketing, LLC ("Geoserve"), an entity that marketed and

promoted securities for two public companies, Hyperdynamics Corp. and Hydrocarb.  Watts's

brother was the CEO of both companies.  (App. 389, 391, 407 [Watts Depo. 12:2 – 13:2; 17:15-

23; 81:1-7].)

5.     In June 2016, after SMDRE had raised approximately $1.4 million from investors,

and after the underlying SEC investigation began, Watts transferred his 49% ownership interest

in SMDRE to Stanley.  (App. 403 [Watts Depo. 66:12-16]; App. 430.)  Watts continued to

control SMDRE's bank accounts and investments after the transfer.    (App. 400-01 [Watts Depo. 55:15-59:6].)

**B.     The SMDRE Promissory Note Offering**

6.     Between February 2015 and February 2017, Watts and Stanley offered and sold SMDRE promissory notes to retail investors to fund SMDRE's investments in oil and gas properties.  Watts and Stanley pitched the note investments as investments in oil and gas.  (*See, e.g.,* App. 72; App. 411 [Watts Depo. at 98:7-100:1].)  The returns (interest rates) paid to SMDRE promissory note investors were tied to the price of oil.  (*See, e.g.,* App. 74.)  Watts testified that at the outset of this offering, his role was to "find the oil and gas properties and Clifton [Stanley] was going to raise money." (App. 399 [Watts Depo. at 50:23-51:12].)  Watts provided the oil and gas expertise.  (App. 400 [Watts Depo. at 53:18-21].)

7.     Watts came up with the plan to offer the notes through SMDRE (App. 399 [Watts Depo. at 50:23-51:12]), and collaborated on the drafting of the offering documents (App. 412 [Watts Depo. at 103:18-22]).  He personally met with at least some of the investors face-to-face before they invested to talk "[a]bout the oil and gas that was being purchased, the operations, how it would be done, what the idea was." (App.410-11, 413 [Watts Depo. at 96:7-97:5; 105:2-7].) He testified that investors "would ask [him] questions about how the oil and gas worked.  In other words, the money would be employed to do this, this, and this.  And they wanted to know how—how the oil and gas, what the upside, and what the potentials were for oil and gas production." (App. 411 [Watts Depo. at 99:1-12].)

8.     During the relevant period, Watts and Stanley raised at least $1,389,575 million from at least 10 investors in Texas and Louisiana through the sale of these notes. (App. 37 [Hahn Dec. ¶ 10].)  In total, SMDRE issued at least 22 promissory notes to investors, with face values

of more than $3.1 million.  (*Id*.)

9.     No registration statement was filed with the Commission for the SMDRE

securities offerings.  (App. 32 [Declaration of Vanessa Ann Countryman, Secretary for the

Commission].)

10.     Watts told investors that their funds would be invested in safe, profit-bearing oil

and gas investments, and promised returns of up to 20% per year based on a formula using the

price of oil. (App. 2-3 [Declaration of investor Julius P. Schmalz IV] ("Schmalz Dec.") ¶6-7;

App. 18 [Declaration of investor Michael T. Smith "Smith Dec." at ¶ 9 (17.6%)].)

11.     For example one of the SMDRE Offering Documents provided that, if the price

was $40 per barrel, then the investor would earn 8% per year on the note, and if the price was

$100 per barrel, then 20% per year.  (App. 2-3 [Schmalz Dec. ¶6]); App. 15.)  Other investors

received a similar chart, with the numbers adjusted.   (App. 78, 81, 84, 101.)  Watts promised to

pay off each note plus interest at the end of a set term—typically five or ten years—by investing

the note proceeds in purportedly safe and profitable oil-and-gas investments.  (*See, e.g.,* App. 3,

4 [Schmalz Dec. ¶¶ 7, 13]; App. 11.)

> ### i.     *False and Misleading Statements in the SMDRE Offering*

12.     In February 2015, Watts and Stanley convinced the first SMDRE investor to

purchase a promissory note for $200,000.  The first investor was Julius P. Schmalz, IV, a person

Stanley and Watts knew from church. (App. 1 [Schmalz Dec. ¶ 3].)  Schmalz agreed to invest

$200,000 of the roughly $300,000 he held in his retirement account.  Stanley and Watts both

signed a SMDRE promissory note dated February 24, 2015 (the "Schmalz Note").  (App. 4

[Schmalz Dec. ¶ 12]; App. 11.)

13.     The documents Watts provided to Schmalz included: (1) a Promissory Note; (2) a Loan Agreement; (3) a chart depicting projected investment returns at various oil prices; (4) a Direction of Investment form from Quest, IRA ("Quest"); and (5) wiring instructions to send his IRA money to SMDRE (the "Offering Documents").  (App. 3 [Schmalz Dec. ¶ 9]; App. 7-15.)

14.     Watts and Stanley met with Schmalz in person to discuss the investment.  (App. 2, at ¶6.) When Schmalz expressed concerns during the sales pitch about potential risks and the security of his investment, Watts assured Schmalz that his investment would be safe, in part, because the note would be backed by Hydrocarb stock.  (App. 2-3, at ¶¶ 6-7.)  Watts gave Schmalz the impression that his investment was risk free.  (*Id.*)

15.     In reality, SMDRE owed more on the Hydrocarb stock that it owned than it was worth.  SMDRE had purchased the Hydrocarb stock in a December 4, 2013 transaction in which SMDRE and Watts's brother, Kent Watts (who was the CEO of Hydrocarb), executed a $1.8 million Sales Agreement and Note pursuant to which SMDRE purchased 1,859,879 shares of Hydrocarb common stock at a $1 per share price  (the "Hydrocarb Note").[2]  (App. 269.)  On May 8, 2014, Hydrocarb conducted a 1:3 reverse stock split, meaning that SMDRE only held 619,960 shares of Hydrocarb Stock, and that the effective price of the stock was $3.00 per share. (App.40-41[Hahn Dec. ¶ 19]; App. 270-75.)

16.     Soon after SMDRE executed the Hydrocarb Note, the value of the stock fell precipitously.  By the time SMDRE issued its first promissory note to Schmalz in February 2015, Hydrocarb's stock price had fallen 70% to around $0.90 per share (as compared to the $3.00 per share effective price of the stock), dwindling in value from $1.8 million to less than $600,000. (App. 41 [Hahn Dec. ¶ 20].)  However, SMDRE still owed $1.8 million on the Hydrocarb Note,

---

[2]  This transaction is at issue in the two other SEC enforcement actions and the criminal case cited in paragraph 2, supra.

meaning that at the time of the note investments, SMDRE's liabilities greatly exceeded the value of its assets. (*Id.*)

17.     On April 13, 2016, approximately one year after the sale of the first SMDRE note, Hydrocarb declared bankruptcy, and the stock, which had already fallen significantly in value, became worthless.   *In re Hydrocarb Energy Corp.,* Case No. 16-31922 (S.D. Tex. 2016).

18.     None of this information regarding SMDRE's indebtedness was disclosed to Schmalz or to later investors.  (App. 5 [Schmalz Dec. ¶16]); App. 19 [Declaration of Michael Tucker Smith ("Smith Dec.") ¶ 17; App. 411 [Watts Depo. 100:9-18].) Investors testified that it would have been important to their investment decisions to know that SMDRE was heavily in debt.  (App. 5 [Schmalz Dec. ¶16]; App. 19 [Smith Dec. ¶ 17].)

19.     Investor Michael Smith had a similar experience.  Smith knew Watts from church, where Watts was a leader who prayed over the offering during church services.  (App. 16 [Smith Dec. ¶ 3].)  Watts solicited Smith's investment during breakfast after a prayer meeting.  (App. 16-17 [Smith Dec. ¶4].)  Smith was unemployed at the time of his investment, which Watts knew.  In hopes of generating interest income during his unemployment, Smith gave Watts $497,000 to invest—nearly all of his retirement savings.  (App. 17 at ¶ 6.)  Watts told Smith that he would be able to purchase "cheap" oil properties with existing production due to falling oil prices, which would lead to significant profits.  (App. 17 at ¶ 5; App. 19 at ¶ 16.)  Watts assured Smith that he was buying leases valued cheaply based on $40 a barrel oil prices.  (App.17 at ¶ 5.)

20.     Watts did not tell Smith that SMDRE would purchase its oil interests exclusively from a company that Watts owned himself.  (App. 19 [Smith Dec. ¶ 16].)  Smith testified that it would have negatively impacted his decision to invest if he had known that Watts was on both

sides of the transaction, stating "I would never expect that he would sell his own properties on the cheap." (*Id.*)

21.     Likewise, Smith testified that Watts never told him that nearly $50,000 of his money would be paid to Stanley as a commission (*i.e.,* for getting him to invest), nor that SMDRE was heavily in debt. (*Id.* at ¶15, 17.) Smith testified that, if he had known either of those facts, it would have negatively impacted his investment decision. (*Id.*)

22.     Smith also testified that when he met with Watts about a year ago (in 2018), Watts gave him several excuses for not being able to pay the interest and principal of the $497,000 note, including that hurricanes had caused flooding that prevented the extraction of oil from SMDRE's oil wells. (App. 20 at ¶19.) Smith reviewed public oil and gas records, and found that to be false. (*Id.*) Further, Watts told Smith that all of the recently filed SEC cases and the criminal case against him in New York were based on old conduct from when he was a broker. He said it was "no big deal, he just got his hand slapped." He also said "the SEC was just out to get him." Later, Smith learned that Watts asked the church pastor to tell Smith and his wife that there was no point in pursuing legal action against him because "there wasn't any money to collect." (*Id.*)

### *ii.     False and Misleading Statements in the SMDRE Loan Agreements*

23.     The Schmalz Note, which Watts and Stanley signed, was accompanied by a document entitled "Loan Agreement." (App. 3, 4 [Schmalz Dec. ¶ 9, 12]); App. 12-14.) The Loan Agreement stated that SMDRE has "extensive knowledge in both the oil and gas markets and the securities markets." (App. 12.) Watts guaranteed that SMDRE would "use its specialized knowledge to produce income sufficient to make principal and interest payments as due per 'the note.'" (*Id.*) The term of the note was five years. (*Id.*)

24.     Under the "Scope of Investments" section of the Loan Agreement, SMDRE promised to invest the funds in oil and gas investments, and warranted that SMDRE "holds and will hold assets valued in excess of 125% of the note." (App. 13.) The Loan Agreement did not disclose the Hydrocarb Note or SMDRE's substantial indebtedness, or the facts that SMDRE's liabilities greatly exceeded its assets. (*Id.*)

25.     As Watts and Stanley offered the SMDRE promissory notes to subsequent investors, they continued to use the same form of loan agreement for each note sold. (App. 39 [Hahn Dec. ¶ 14].) Watts and Stanley drafted the notes and the loan agreements as a "collective effort" based on forms that Stanley had from prior offerings. (App. 412 [Watts Depo. at 103:18-22].)

26.     Each loan agreement SMDRE provided to investors represented that SMDRE would invest "in oil and gas investments" and specified the use of investor funds as including:

a.      The purchase of oil and gas wells on a working interest basis.

b.      The purchase and sale of mineral rights and or royalties and or overriding royalties.

c.      The purchase and sale of oil and gas, Stocks, Futures, Exchange Traded funds, Mutual Funds, Hedge Funds, notes or bonds.

d.      The purchase and sale of options related to the above items.

e.      The purchase, sale and or leaseback of oil and gas related equipment and / or pipelines and / or gathering systems.

f.      The financing of any of the items above.

g.      The administrative costs to market and manage the above.

(App. 72, 75, 85, 90, 96, 102, 106.)

27.     The loan agreements did not disclose that Watts paid Stanley a 10%-15% commission on almost every investment. (*Id.*; App. 404, 409-10 [Watts Depo. 72:3-8; 92:19-

95:21].) Moreover, Watts did not tell investors about the commissions paid to Stanley. (App. 410-11 [Watts Depo. 96:24-97:12.].) For example, neither Watts nor Stanley disclosed to Schmalz that the first $20,000 of his $200,000 investment would be paid to Stanley (App. 5 [Schmalz Dec. ¶14]). Nor did they tell Smith that the first $49,700 of his $497,000 investment would be paid to Stanley (App. 19 [Smith Dec. ¶15]). As soon as investor money came in to SMDRE's bank account, Watts paid Stanley about 10% of investor deposits, as "compensation for him putting the money together." (App. 410 [Watts Depo. 93:6 – 95:21]; App. 38 [Hahn Dec. at ¶13].) Watts also testified that, other than the note agreements, no written disclosures were given to SMDRE investors. (App. 410-11 [Watts Depo. 96:24 – 97:25- 98:3].)

28. Ultimately, Watts used investor funds to pay Stanley over $140,000 in commission payments to sell SMDRE notes. (App. 38 [Hahn Dec. ¶ 13]; App. 404, 410-11 [Watts Depo. 72:3-18; 96:24-97:15].) Watts, who controlled SMDRE's bank accounts, signed the checks and facilitated these payments to Stanley. (App. 400 [Watts Depo. 54:18-56:4]; App. 38 [Hahn Dec. ¶ 13].)

29. The loan agreements used by SMDRE also contained a representation that SMDRE guaranteed to use its specialized oil-and-gas knowledge to produce income sufficient to make principal and interest payments when due. (*See, e.g.,* App. 72.) It failed to disclose that SMDRE invested exclusively in oil-and-gas properties owned by Watts and his entities, which required the use of no specialized oil-and-gas knowledge. (*Id.*) Watts did not tell investors that SMDRE would use investor funds to acquire oil and gas properties exclusively from a Watts or a company he owned in transactions that were not done at arm's length (as Watts was on both sides of the oil and gas purchase transactions). (App. 5 [Schmalz Dec. ¶ 15]; App. 19 [Smith Dec. ¶16].) Watts admitted that he caused SMDRE to send money from the SMDRE bank

account to Lifestream, a company wholly owned by Watts, which he testified was for the purchase of oil and gas interests. (App. 408 [Watts Depo. 86:17-87:9].)

30. In March 2015, SMDRE promised to pay Watts $1,276,500. In September 2016, SMDRE promised to pay Watts another $2,116,821. As a result of these and other transactions, which were funded with debt, SMDRE owed more than $3.4 million to Watts-controlled entities. (App. 43 [Hahn Dec. ¶¶ 26].)

31. During the relevant period, SMDRE incurred millions of dollars in additional debt without a proportionate increase in its assets. SMDRE's debt eventually exceeded $6.7 million, including the $3.4 million of debt to Watts discussed above. (*Id.*; App.43 [Hahn Dec. ¶26].)

32. Watts testified that neither he nor Stanley disclosed the financial state of SMDRE to investors. (App. 411 [Watts Depo. at 100:2-18].)

33. SMDRE paid at least $1,276,500—virtually all of the investor funds it received— to Lifestream, an entity wholly-owned and controlled by Watts, to purchase oil and gas lease interests from Lifestream (the "Oil Properties"). (App. 40 [Hahn Dec. ¶¶ 16].) The Oil Properties were later acquired back by Lifestream in a written agreement between Watts and Stanley, for no compensation to SMDRE and for an additional debt of $1,293,179 owed by SMDRE to Geoserve. (*Id.* ¶23-24.) Over time, SMDRE paid out almost $800,000 in additional funds to Watts and Geoserve. (App. 69.)

### iii. Deceptive Conduct Related to the Hydrocarb Note

34. In April 2015—after SMDRE had already issued nearly $1.4 million worth of notes—Hydrocarb agreed to reduce the balance payable on the Hydrocarb Note to $619,898. (App. 41 [Hahn Dec. ¶¶ 21].) SMDRE later paid $531,000 on the Hydrocarb Note, bringing the

balance that SMDRE owed down to about $89,000. (*Id.*)  In January 2016, Hydrocarb wrote off this remaining balance as uncollectible and disclosed this fact in a later SEC filing. (*Id.*)

35.　　In 2016, after most of the SMDRE notes were issued, Watts's company, Geoserve, purchased the Hydrocarb Note, so that any amount SMDRE owed on it would then be payable to Geoserve.  (*Id*; App. 395-96, 415 [Watts Depo. 36:7-40:21; 113:2-114:1].)

36.　　On September 1, 2016, Watts caused SMDRE to enter into a Note and a Loan Settlement and Option Agreement with Geoserve (the "Settlement Agreement") in which SMDRE agreed that it still owed $1,293,179 on the Hydrocarb Note.  (App. 42 [Hahn Dec. ¶¶ 22].)  In effect, Watts revived SMDRE's payment obligation under the Hydrocarb Note, even though SMDRE had already paid more than 85% of the reduced balance and Hydrocarb had written off the remainder as uncollectible.  (*Id.*)

37.　　As part of the Settlement Agreement, SMDRE executed a new note for approximately $1.3 million payable to Watts or to either of his companies, Geoserve or Lifestream.  (*Id.* ¶ 23; App. 295.)  The Agreement also required SMDRE to assign to Lifestream substantially all the oil and gas properties it owned.  (*Id.*)  This transaction served to return to Watts—in exchange for no cash compensation—the very oil and gas properties he had previously sold to SMDRE in March 2015.  (*Id.*; App. 415 [Watts Depo. 114:11-115:2].)

38.　　Shortly after he signed the Agreement, Watts took possession of the SMDRE oil and gas properties and they sold them to a third party for $723,811. (App. 397-38 [Watts Depo. 42:14-17; 44:19-45:4].)  Watts testified that all of the money went to him.  (App. 398 [Watts Depo. 45:5-22].)

39.　　Also on September 1, 2016 (the same day the Agreement was signed), SMDRE became more indebted to Watts/Lifestream, when Watts and Stanley arranged for Watts to sell

SMDRE more oil and gas properties in exchange for SMDRE executing a $2.1 million note. (App. 378-384.)

40.     At about the same time, Stanley engaged in a scheme to transfer Lifepay's promissory-note liabilities onto SMDRE, thereby burdening SMDRE's note investors with the indebtedness from the Lifepay Ponzi scheme.  On August 1, 2016, Stanley executed a "Purchase Contract For Real Estate" between himself and SMDRE. Under the contract, SMDRE agreed to repay $2.4 million in Lifepay promissory notes in exchange for beneficial ownership of two empty lots and three condominiums in Branson, Missouri.  (App. 421-24.)  Watts testified that he was aware that SMDRE was issuing notes to Lifepay investors.  (App. 403 [Watts Depo. 65:14-18].)

41.     In the aftermath of the foregoing transactions, SMDRE was left with liabilities exceeding $3.4 million owed to Watts and his entities and an obligation to pay principal and interest on more than $3.1 million of promissory notes owed to SMDRE and Lifepay promissory note investors.  (App. 37, 43 [Hahn Dec. ¶ 10, 26].)

42.     Meanwhile, Watts and Stanley paid themselves and their non-SMDRE entities more than $2 million in funds from SMDRE during the relevant time period, including all of the investor funds.  (App. 69.)

## VI.     ARGUMENT AND AUTHORITIES

### A.     The Court Should Grant Summary Judgment on the SEC's First Claim for Relief Because Watts Violated Section 5 of the Securities Act.

#### 1.     Section 5 Imposes Strict Liability for the Sale of Unregistered Securities.

Sections 5(a) and (c) of the Securities Act require that a registration statement be filed for every security.  15 U.S.C. § 77e(a), (c).  If no registration is filed, then it is unlawful for anyone to use interstate commerce or the mail to offer or sell the security unless an exemption from

registration is established.  *Id.*; *SEC v. Continental Tobacco Co.*, 463 F.2d 137, 155 (5th Cir. 1972).  The registration statement is "central to the [Securities] Act's comprehensive scheme for protecting public investors."  *SEC v. Aaron,* 605 F.2d 612, 618 (2d Cir. 1979), *vacated on other grounds*, 446 U.S. 680 (1980).  Exemptions to registration are narrowly construed.  *Id.* at 618; *Continental Tobacco Co.*, 463 F.2d at 155.  Each offer or sale must be registered or exempt. *Continental Tobacco Co.*, 463 F.2d at 155*; Allison v. Ticor Titel Ins. Co.,* 907 F.2d 645, 648 (7th Cir. 1990).

The Securities Act imposes strict liability for violations of Section 5, and no showing of negligence or scienter is required.  *Swenson v. Engelstad,* 626 F.2d 421, 424 (5th Cir. 1980). Because intent is irrelevant, the SEC does not need to prove that the defendant knowingly, recklessly, or even negligently committed the violation.  *Id.*; *see SEC v. Holschuh*, 694 F.2d 130, 137 n.10 (9th Cir. 1982) ("good faith is not relevant to whether there has been a primary violation of the registration requirements"). Thus, to establish a *prima facie* Section 5 violation, the Commission need only prove that there is no dispute of material fact that Watts:  (1) sold or offered to sell securities; (2) through interstate transportation or communication; (3) when no registration statement was in effect as to the transaction.  *Id.* at 425; *Continental Tobacco Co.*, 463 F.2d at 155-156.

Once the Commission establishes these elements, the burden of proof shifts to the defendant to prove the securities offered or sold qualified for a registration exemption.  *SEC v. Ralston Purina Co.,* 346 U.S. 119, 126 (1953); *Continental Tobacco Co.*, 463 F.2d at 156.  If the defendant fails to put forth evidence that raises a genuine issue of fact, the Commission is entitled to summary judgment on its Section 5 clams.  *See, e.g., SEC v. Platforms Wireless International Corp.*, 617 F.3d 1072, 1092 (9th Cir. 2010) (affirming summary judgment in favor

of the Commission as to Section 5 claim where defendants failed to establish exemption); *SEC v. Farmer*, No. 4:14-CV-2345, 2015 WL 5838867, *18 (S.D. Tex. Oct. 7, 2015) (granting SEC summary judgment on Section 5 claims where SEC made *prima face* case that unregistered company shares placed with defendant were sold to investors).  Here, the SEC easily satisfies this required showing.  The Court should grant summary judgment in favor of the Commission on this claim because the offerings were not registered, and there can be no genuine issue of material fact as to whether the securities offerings at issue in this case were exempt from Section 5's requirements.

  **2.**  **The SEC Has Established a *Prima Facie* Section 5 Violation.**

  Watts offered and sold securities, in the form of SMDRE promissory notes, using the mails and other interstate means, including e-mail and wire transfers.  No registration statement has been filed as to those securities.  (SOF ¶ 9.)  The undisputed record shows that the SEC has proven all of the elements required to establish that the defendants violated Sections 5(a) and 5(c).  As a threshold matter, there is no dispute that SMDRE promissory notes are securities as either notes or investment contracts.  *See Reves v. Ernst & Young,* 494 U.S. 56, 64–68 (1990); *SEC v. W.J. Howey Co.,* 328 U.S. 293, 301 (1943).  *See also SEC v. Cross Fin'l Svcs., Inc.,* 908 F. Supp. 718, 728 (C.D. Cali. 1995).  Watts admitted that he was involved in the securities offering, in that he participated in sales pitch meetings.  (SOF ¶ 7.)  Watts came up with the plan to offer the notes through SMDRE and collaborated in drafting of the offering documents.  (*Id.*)  He also admitted that he met with investors to discuss the offering and "[a]bout the oil and gas that was being purchased, the operations, how it would be done, what the idea was." (*Id.*)  Watts met with prospective investors and spoke with them about how their money would be invested.  For example, he testified that investors "would ask questions about how the oil and gas worked.

In other words, the money would be employed to do this, this, and this. And they wanted to know how—how the oil and gas, what the upside, and what the potentials were for oil and gas production." (*Id.*) It cannot be disputed that Watts offered and sold securities.

Second, it cannot be disputed that Watts offered and sold the notes in interstate commerce, because they were sold to investors in Texas and Louisiana, and SMDRE received investor funds through wire transfers and/or mailed checks, and communicated by email. (SOF ¶ 8.) Third, it is undisputed that the SEC has no registration statement on file for SMDRE's securities. (SOF ¶ 9.) Watts cannot meet his burden to establish an exemption, because no exemption to the registration requirements is applicable here.

Therefore, summary judgment against Watts on the SEC's Section 5 claim is proper.

**B.     The Court Should Grant Summary Judgment on the SEC's Second and Third Claims for Relief Because Watts Defrauded Investors.**

Competent summary judgment evidence conclusively establishes that Watts made material misrepresentations and omissions in his offers and sales of SMDRE securities in the form of promissory notes, with the requisite mental state. Because there is no genuine issue of material fact regarding Watts's fraud, the Court should grant the SEC's motion on its second and third claims for relief pursuant to Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

**1.     Elements of Securities Fraud**

Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), prohibits fraud in the offer or sale of securities, and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, prohibit fraud in connection with the purchase or sale of any security. To establish a prima facie case under Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act, and Rule 10b-5, the SEC must prove by a preponderance of the

evidence: (1) a material misrepresentation, omission of material fact, or other fraudulent device; (2) in connection with the purchase, offer, or sale of a security; (3) with the requisite mental state. *Aaron v. SEC,* 446 U.S. 680, 695 (1980); *SEC v. Gann,* 656 F. 3d 932, 936 (5th Cir. 2009); *SEC v. Seghers,* 298 F. App'x 319, 328 (5th Cir. 2008). Violations of Section 17(a)(1), Section 10(b), and Rule 10b-5 require a showing of scienter. *Aaron,* 446 U.S. at 697. Violations of Sections 17(a)(2) and (a)(3) require, at most, a showing of negligence. *See SEC v. Hopper,* 2006 WL 778640 at *9 (S.D. Tex. Mar. 24, 2006).

Congress intended that courts construe antifraud securities legislation "not technically and restrictively, but flexibly to effectuate its purpose." *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 195 (1963) (footnote and internal quotations omitted). "A fundamental purpose, common to [securities antifraud] statutes, was to substitute a philosophy of full disclosure for the philosophy of caveat emptor []." *Id.* at 186.

The element of scienter is defined as a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). In the Fifth Circuit, scienter is established by a showing that the defendants acted intentionally or with severe recklessness. *See Broad v. Rockwell Int'l Corp.*, 642 F. 2d 929 (5th Cir.) *en banc, cert. denied* 454 U.S. 965 (1981).

The "in connection with" requirement "is met if the fraud alleged 'somehow touches upon' or has 'some nexus' with 'any securities transaction.'" *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993). Because of Watts's participation in the offer or sale of SMDRE securities in the form of promissory notes, the second element here has been satisfied and cannot be disputed: the statements were "in connection" with the offer, purchase, or sale of SMDRE securities. Therefore, Watts made material misrepresentations or omissions, or used a fraudulent

device, and acted with the requisite mental state.

Watt's conduct, weighed against these standards, clearly demonstrates that he violated the antifraud provisions of the Securities Act and Exchange Act.

### 2. Watts Made Material Misrepresentations and Omissions Associated with the Promissory Notes and the Use and Disposition of Investor Funds.

"[T]he standard for misrepresentation is whether the information disclosed, understood as a whole, would mislead a reasonable potential investor. [And a] statement or omitted fact is material if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *SEC v. Provident Royalties, LLC*, 2013 WL 5314354, at *4 (N.D. Tex. Sept. 23, 2013) (*quoting SEC v. Seghers,* 298 F. App'x 319, 328 (5th Cir. 2008); *see SEC v. Gann,* 565 F.3d 932, 937 n.17 (5th Cir.2009). Liability arises not only from affirmative representations but also from failures to disclose material information. *SEC v. Dain Rauscher*, 254 F.3d 852, 855-56 (9th Cir. 2001). "An omitted fact is material 'if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1092 (9th Cir. 2010) (quoting *Phan*, 500 F.3d at 908). In other words, a misrepresentation, misstatement, or omission is material if there is a substantial likelihood that a reasonable investor would consider the true or complete information important in making an investment decision. *See id.* The antifraud provisions of the securities statutes and regulations impose a "'duty to disclose material facts that are necessary to make disclosed statements, whether mandatory or volunteered, not misleading.'" *SEC v. Fehn*, 97 F.3d 1276, 1290 n.12 (9th Cir. 1996) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 504 (9th Cir. 1992)).

Here, a reasonable investor would want to know that: (1) in direct conflict with the

representations in the offering documents, about 10 cents of every dollar they invested was going to be used to pay Stanley commissions—rather than for the stated purpose, oil and gas investment; (2) despite telling investors that they were purchasing properties on the "cheap," SMDRE purchased lease interests exclusively from an entity Watts owned using debt, in transactions that were not at arm's length; (3) SMDRE's liabilities greatly exceeded its assets, making promised returns impossible; and (4) nearly every dollar of investor money went to Watts, Stanley, and other entities they controlled.  Because there are no fact issues to be determined at trial on this matter, the Court should find that each of these misrepresentations and omissions operated as a fraud, and grant summary judgment for the SEC on its fraud claims.

### 3. Examples of Watt's Fraud

#### a. *Watts violated Sections 17(a) and 10(b) by failing to disclose the commissions that he paid to Stanley for finding investors.*

Each loan agreement SMDRE provided to investors represented that SMDRE would invest "in oil and gas investments" and specified the use of investor funds as including:

a. The purchase of oil and gas wells on a working interest basis.

b. The purchase and sale of mineral rights and or royalties and or overriding royalties.

c. The purchase and sale of oil and gas, Stocks, Futures, Exchange Traded funds, Mutual Funds, Hedge Funds, notes or bonds.

d. The purchase and sale of options related to the above items.

e. The purchase, sale and or leaseback of oil and gas related equipment and / or pipelines and / or gathering systems.

f. The financing of any of the items above.

g. The administrative costs to market and manage the above.

(SOF ¶ 26.)  Meanwhile, as Watts testified, and the bank records establish, as soon as investor

money came in to SMDRE's bank account, Watts paid Stanley roughly 10% of whatever investor funds came in, as "compensation for him putting the money together." (SOF ¶ 27.) Watts testified that he never told investors that a significant portion of their money would go to Stanley, and that no written disclosures were given to SMDRE investors. (*Id.*)

Watts's omissions regarding the commissions he paid to Stanley for directing investors to SMDRE are material as a matter of law. *See, e.g., SEC v. Feng,* 2017 WL 6551107 at *10 (granting the SEC's motion for summary judgment and finding defendants' failure to disclose the receipt of commissions/ referral fees material as a matter of law); *United States v. Laurienti,* 611 F.3d 530, 541 (9th Cir. 2010) ("In deciding whether to buy a given stock, a reasonable investor would consider it important that, in contrast to the purchase of most stocks, the broker would receive a 5% commission from the purchase of this particular (house) stock."). Investors were entitled to know that Stanley might be recommending that they invest in SMDRE based upon his own financial interest, rather than the investment value of the security. *See SEC v. Hasho,* 784 F. Supp. 1059, 1110 (9th Cir. 1992). Clearly, a reasonable investor would find it important that before any oil and gas investment was made, 8-15% of the money had gone out the door and would not be used for the disclosed investment purpose. Investor Smith testified that it was important to him. (SOF ¶ 21.)

Watts's admitted failure to disclose to investors that Stanley had a personal, financial interest in recommending the investment, and that a substantial portion of their money would go to something other than the investment purpose, evidences intentional conduct. At a minimum, Watts was severely reckless in hiding this information from investors.

> **b.** **Watts violated Sections 17(a) and 10(b) by failing to disclose his related party transactions and conflicts of interest.**

Watts failed to disclose to investors that SMDRE would purchase oil and gas assets exclusively from Watts and his entity. The loan agreements he helped draft and gave to investors stated that SMDRE "guarantees to use its specialized knowledge to produce income sufficient to make principal and interest payments as due per 'the note.'" (SOF ¶ 23.) Watts admitted that, after commissions were paid to Stanley, Watts caused SMDRE to send the remaining money from the SMDRE bank account to Lifestream, a Watts-owned company. (SOF ¶ 29.) During the course of the offering, SMDRE noteholders invested at least $1,389,575. Of that, SMDRE paid at least $1,276,500—virtually all of the funds it raised—to Lifestream. (SOF ¶ 33.) Over time, SMDRE paid an additional $800,000 to Watts and Geoserve Marketing, LLC, another entity Watts owned. (*Id*.)

Furthermore, after the Hydrocarb Note was paid down and partially forgiven, and Hydrocarb publically reported that it had written off the debt, Watts orchestrated a series of transactions that gratuitously revived SMDRE's payment obligation under the Hydrocarb Note, but this time the payments—of nearly $1.3 million—were due to Watts and/or his companies. (SOF ¶ 36.) Watts then caused SMDRE to assign to Lifestream substantially all the oil-and-gas properties then owned by SMDRE. (SOF ¶37.) These were the same properties that SMDRE had purchased from Lifestream in March 2015 with SMDRE investor funds. Shortly after the agreement was signed, Watts took possession of the SMDRE oil-and-gas properties and sold them to a third party for $723,811. (SOF ¶ 38.) Thus, Watts sold for himself the same properties he had previously sold to SMDRE. Watts testified that all of the money went to him. (*Id*.)

This egregious and undisclosed self-dealing between SMDRE and Watts clearly presents conflicts of interest which are material and should have been disclosed to potential investors. *See, e.g., SEC v. Alliance Leasing Corp.,* 2000 WL 35612001, *8 (S.D. Cali. Mar. 20, 2000)

(granting summary judgment for the SEC when defendants failed to disclose self-dealing business relationships to investors), *aff'd SEC v. Alliance Leasing Corp.,* 28 Fed. Appx. 648 (9th Cir. 2002); *Vernazza v. SEC,* 327 F. 3d 851, 859 (9th Cir.), *amended,* 335 F.3d 1096 (9th Cir. 2003) ("It is indisputable that potential conflicts of interest are 'material' facts with respect to clients."). The fact that Watts met with investors to discuss details of the investment and "how it would be done," yet did not tell them: (1) that he would only purchase those assets from himself in transactions not done at arm's length evidences a high degree of scienter; and (2) that he would load-up SMDRE with debt for his own profit. At a bare minimum, this conduct is severely reckless.

        **c.**        ***Watts violated Sections 17(a) and 10(b) by failing to disclose SMDRE's poor financial condition.***

The SMDRE Offering Documents warranted to investors that SMDRE held, and will hold, assets in excess of 125% of the Note. Because all of SMDRE's purchases of oil and gas interests were funded by using additional debt (payable to Watts-owned entities), the representations that SMDRE had sufficient assets to repay its noteholders was false and misleading from the very beginning, and became more so as SMDRE became deeper in debt to Watts and the SMDRE note investors. At the time the first person invested, SMDRE was already over a million dollars in debt. (SOF ¶ 16.) Eventually SMDRE's indebtedness exceeded $6.7 million. (SOF ¶ 31.) Yet, Watts continued to provide investors with profit projections showing high returns and guaranteed no loss to their principal. (SOF ¶ 18.) At the time he gave these projections to prospective investors, Watts knew that the company was deeply in debt (he signed the Hydrocarb note and personally indebted SMDRE), yet he failed to disclose that fact to those trusting him with their money. This evidences a high degree of scienter.

Watts's failure to disclose SMDRE's negative financial information to prospective investors violates the antifraud provisions. *See, e.g., Hasho*, 784 F. Supp. at 1109; *see also SEC v. Tecumseh Holdings,* 765 F. Supp. 2d 340, 351 (S.D.N.Y. 2011) (granting summary judgment for SEC and concluding that profit projections were fraudulent when at the time the project was made, the defendant knew that the company was operating at a loss and had done so in the prior year also). The fact that SMDRE was heavily in debt is something to which a reasonable investor would attach importance. *See Hasho,* 784 F. Supp. at 1109; *SEC v. Murphy,* 626 F.2d 633, 653 (9th Cir. 1980) ("Surely the materiality of information relating to financial condition, solvency and profitability is not subject to serious challenge.") A prospective investor in oil and gas assets would have considered it quite significant that the viability of the entity in which he was investing was dependent upon the ability to climb out of debt and generate new capital, and that the promised returns might prove illusory. *Murphy,* 626 F.2d at 653. In fact, investors Schmalz and Smith both testified that they attached importance to such information. (SOF ¶ 18.)

> **d.** **Watts violated Sections 17(a) and 10(b) by misrepresenting the use and disposition of investor funds.**

The SMDRE loan agreements represented that SMDRE would use investor funds "to acquire oil and gas assets." (SOF ¶ 24.) Contrary to this representation, Watts used investor funds to line his and Stanley's own pockets. Watts did not tell investors about commissions or payments to himself or companies he owned, thus rendering representations about the use of funds misleading. Watts and Stanley took nearly <u>every dollar</u> deposited in SMDRE's bank accounts during this time period for themselves, including all of the investor funds. (SOF ¶ 42.) In fact, Watts and Stanley paid themselves more than $2 million from the SMDRE accounts during the relevant time period. (*Id.*)

Further, the transfer of Lifepay's promissory note liabilities onto SMDRE served no

investment purpose, and to the contrary, simply burdened SMDRE's investors with the indebtedness from the Lifepay Ponzi scheme. Watts testified that he knew this was happening. (SOF ¶ 40)

In addition, SMDRE's "investment" in the two empty lots and three condominiums that Stanley dumped on SMDRE directly contradicted the promises to invest in oil and gas investments. (SOF ¶ 40.) Thus, the loan agreements' promises to invest funds in "oil and gas assets" and their explanations of the use of funds were false and misleading, as Watts knew or was severely reckless in not knowing.

### 4. Watts Violated Sections 17(a)(2) and 17(a)(3) of The Securities Act.

Watts's conduct in failing to disclose clearly material information to investors and engaging in egregious, undisclosed self-dealing conclusively demonstrates that he violated Sections 17(a)(2) and (a)(3) of the Securities Act. These provisions require, at most, a showing of negligence. *See, e.g.*, *SEC v. Hopper*, 2006 WL 778640 at *9 (S.D. Tex. Mar. 24 2006). While the SEC believes the evidence strongly supports that Watts acted with scienter for all the reasons discussed herein, there is no doubt that he at least acted negligently. The effect of his conduct on members of the investing public justifies a finding that he violated, at a minimum, Sections 17(a)(2) and 17(a)(3) of the Securities Act.

### VII. CONCLUSION

For the foregoing reasons, the Court should grant Plaintiff's Motion for Summary Judgment as to Watts. If the Court grants this motion, Plaintiff will file a motion for remedies, asking the Court to issue a final judgment imposing a permanent injunction, disgorgement with prejudgment interest, and civil penalties.